Filed 6/4/13  In re Y.L. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re Y.L., a Person Coming Under the Juvenile Court Law. | |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | C071787 |
| Plaintiff and Respondent, | (Super. Ct. No. J05709) |
| v. | |
| J.S. et al., | |
| Defendants and Appellants. | |

T.L. (father) and J.S. (mother), the parents of two-year-old Y.L., appeal from an order of the San Joaquin County Juvenile Court terminating their parental rights.

On appeal, father contends the juvenile court erred when it (1) entered a dispositional order bypassing his reunification services before it found the dependency petition was true, and (2) failed to inquire regarding his heritage as required by the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.).  Mother joins in father's arguments and asserts that, if the order terminating parental rights is reversed as to father, it must

1

also be reversed as to her.  We conclude that while the juvenile court may have entered its dispositional order against father prematurely, the court reaffirmed the order at a later hearing.  In any event, any error was harmless.  With regard to ICWA, we conclude there is no evidence an inquiry was made as to father's Indian heritage.  Accordingly, the matter must be remanded for ICWA compliance.

FACTUAL AND PROCEDURAL BACKGROUND

*Originating Circumstances*

In January 2011, Y.L. was born by cesarean section at a local hospital.  Nine days later, mother experienced difficulty breathing and returned to the hospital where she tested positive for methamphetamine.  Hospital staff contacted child protective services (CPS) expressing concern that, if mother is using methamphetamines, she may be unable to care for Y.L.

Later that month, a social worker interviewed mother who stated father did not participate in Y.L.'s life, but his mother (the paternal grandmother) resided next door and cared for Y.L. while mother went to medical appointments.

Mother indicated she had four other children who were not in her care.[1]  One child had been removed because mother had tested positive for methamphetamine at his birth.  The others were not in her care because she had been imprisoned for two years for burglary.  Mother denied she currently was using drugs and suggested the recent positive test had been caused by her use of an inhaler.

Mother underwent a drug assessment that recommended she undergo random drug testing.  But two months passed and, due to financial difficulties, mother did not begin

---

[1]  Mother refers to Y.L. having four half siblings, yet a later report lists five half siblings with whom mother had failed to reunify.  The number of half siblings is not at issue nor are the half siblings parties to this appeal.

2

the random testing. Father was not involved with Y.L. and his whereabouts remained unknown. Y.L. was not detained.

### Petition

In May 2011, a petition was filed alleging Y.L. came within the provisions of Welfare and Institutions Code section 300, subdivisions (b) [failure to protect], (g) [no provision for support], and (j) [abuse of sibling].[2] The petition alleged the drug test at the hospital and mother's denial of current or recent drug use, mother's failure to undergo random drug testing, the social worker's inability to contact mother, and mother's failure to keep an intake appointment at an outpatient drug testing program. The petition also alleged the parents have extensive criminal histories that put Y.L. at "greatly increased risk of abuse and neglect," father's whereabouts and ability to care for Y.L. are unknown, and mother's extensive history of substance abuse led to the removal and subsequent adoption of five half siblings.

### Detention

Neither parent appeared at the initial hearing in May 2011. The court ordered Y.L. detained and issued a protective custody warrant.

### Jurisdiction and Disposition

In late May, mother was cited to appear in court. She made her first appearance on June 14, 2011. Mother identified father as the father of Y.L., indicated she did not know his whereabouts, and stated his mother resides next door to her. The court appointed counsel for mother and ordered her to take Y.L. to a children's shelter. However, mother did not do so, and the court issued a bench warrant for her arrest.

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

At the jurisdiction hearing on June 28, 2011, the court was informed mother had failed to surrender Y.L. and their whereabouts were unknown. The court found that notice had been given and found the petition was true.

Later that day, mother's counsel advised the court that mother was in custody and Y.L. was with her maternal aunt in Stockton. Still later that day, mother's counsel told the court Y.L. and the maternal aunt were in Imperial County. At a contempt hearing the next day, mother telephoned the paternal grandmother who brought Y.L. to the court. The grandmother stated she did not know the whereabouts of father. The bench warrant for mother was recalled and she was granted supervised visitation with Y.L.

The July 26, 2011, disposition report stated three addresses had been identified for father, including the addresses of mother and the paternal grandmother. Mother continued to deny knowledge of father's whereabouts.

The report indicated ICWA does or may apply based on mother's claim of Apache ancestry.

The report recommended mother's reunification services be bypassed pursuant to section 361.5, subdivision (b), paragraphs (10) [termination of reunification for half siblings], (11) [termination of parental rights to half siblings], and (12) [conviction of a violent felony]. The report recommended father's services be bypassed pursuant to paragraphs (10) and (11).[3]

In August 2011, a contested disposition hearing was set for September 1, 2011, and a hearing for ICWA issues and personal jurisdiction as to father was set for September 27, 2011. ICWA notices containing mother's information were sent to the Bureau of Indian Affairs (BIA) and various Apache, Blackfeet, and Cherokee tribes.

---

[3] The report recommended that father not receive services because he is not a "presumed father." This recommendation was mooted by the juvenile court's subsequent finding he is a presumed father.

4

At the September 1, 2011, contested disposition hearing, the juvenile court noted that father, who was not present, had received notice at two of the three identified addresses. Based on a declaration of paternity attached to the disposition report, the court declared father the presumed father of Y.L. The court adjudged Y.L. a dependent child of the court, bypassed both parents' reunification services, scheduled a selection and implementation hearing, orally advised mother of her right to petition for an extraordinary writ, and ordered that father receive a writ notice at all three of his possible addresses.

At the September 27, 2011, hearing this exchange occurred:

"[Counsel for San Joaquin County Human Services Agency (Agency)]: Your Honor, does the Court show on the 1st of September you proceeded in the father's absence *and found the petition true*?

"THE COURT: I found [father] was the presumed father. [¶] . . . [¶] And notice of that hearing to father, notice was given. Did I take juris[diction] to father previous?

"[Counsel for Agency]: No. That's what I was wondering. Did the court proceed in his absence on the 1st of September? I have it on for juris[diction] today.

"THE COURT: No, not on the 1st of September. *Mother was the only one that was present and she submitted on the bypass.*" (Both italics added.)

No counsel advised the court that *it had bypassed both parents* on September 1, 2011. The matter was continued to provide notice to father.

Father was not present at the hearing on October 18, 2011. After finding that father had been properly noticed for the hearing at all three addresses, the juvenile court found the petition's "allegations as to him to be true." When counsel for the Agency noted that the disposition report had recommended bypassing services for father, the court responded, "I think I've already acted. [¶] . . . [¶] I acted on it in advance," effectively reiterating its earlier ruling. The court ordered that writ notice be sent to father's three addresses.

*Selection and Implementation*

The selection and implementation report indicated father recently had contacted the agency regarding visits with Y.L. He had not participated in the dependency proceedings and did not establish a parent-child relationship with her. Mother had continued to deny her unresolved issues with substance abuse. The recommendation was to terminate both parents' parental rights.

At the December 28, 2011, selection and implementation hearing, the juvenile court noted father had been personally served for the hearing but was not present. The court was informed father was in custody and needed to be transported.

The January 24, 2012, status review report stated mother had been arrested for petty theft with a prior theft related conviction and had a projected release date in March 2012. The January 2012 status review hearing was continued because both parents were in custody.

The February 1, 2012, periodic review hearing was father's first appearance in these proceedings. Father gave the paternal grandmother's address as his mailing address and indicated he was listed on Y.L.'s birth certificate. Counsel was appointed for father and the matter was continued.

At the February 15, 2012, periodic review hearing, father's counsel expressed the belief that father had not received notice of previous proceedings, and the lack of notice prevented his receipt of reunification services. The court told counsel the issue needed to be addressed by motion. It ordered the parents to be present at the April 18, 2012, selection and implementation hearing.

In April 2012, the Agency filed a declaration describing its efforts to identify tribal affiliation and ICWA responses from the tribes. The responses indicated Y.L. was not eligible for membership in any of the tribes. The Agency also filed a supplemental selection and implementation report indicating a prospective adoptive family for Y.L. had

6

been identified. The report stated the parents had visited Y.L. Although their interaction was friendly, it did not reflect a parent-child relationship.

At the April 18, 2012, selection and implementation hearing, father did not object to the ICWA declarations filed with the juvenile court or to the court's subsequent ruling that ICWA did not apply to this matter. The parents requested a contested hearing. Father's request for an increase in visitation was denied.

On April 23, 2012, father filed a section 388 petition requesting reunification services. The petition was denied because father's circumstances had not changed and reunification services were not in Y.L.'s best interest.

At the August 3, 2012, contested selection and implementation hearing, the juvenile court heard testimony from the visitation supervisor and the parents. Father testified he had four visits with Y.L., each lasting an hour. Mother testified that, with the exception of eight visits missed as a result of her incarceration, she had maintained weekly visits with Y.L.

Following the presentation of testimony, the juvenile court ruled that no evidence had been presented to show any detriment to Y.L. if parental rights were terminated. The court noted that, since detention, Y.L. has spent a total of four hours with father. Neither parent had shown Y.L. would suffer detriment were the adoption to proceed. The court ordered the termination of both parents' parental rights.

DISCUSSION

I

*Statutory Notice to Father*

Father contends the juvenile court erred when it entered a dispositional order bypassing his reunification services before it found the dependency petition was true. He claims the dispositional order is void, and the subsequent termination of parental rights should be vacated. We disagree.

7

"In dependency matters, parents are entitled to notice and an opportunity to be heard at every stage of the proceeding in order to protect their fundamental interest in the companionship, care, custody and management of their children. [Citations.] But parents are not served with process in the usual sense. [Citation.] Dependency proceedings often commence on an emergency basis with a detention hearing, and under section 290.1, notice of a detention hearing may be 'written or oral.' [Citation.] If the parents were present at the detention hearing, it is permissible to thereafter serve a copy of the petition and a notice of the jurisdictional and dispositional hearings by first-class mail. [Citations.] *If parents were not present at the detention hearing, they must be personally served with a copy of the petition and notice of the jurisdictional and dispositional hearings served by 'certified mail, return receipt requested.'* [Citation.] Notice of the review hearings held under section 366.21 and 366.22, which generally follow the jurisdictional and dispositional hearings, may be provided by 'first-class mail addressed to the last known address of the person to be noticed.' [Citation.]" (*In re Jennifer O.* (2010) 184 Cal.App.4th 539, 545-546; italics added.)

In this case, father was not personally present at the detention hearing, and his whereabouts remained unknown at the time of the June 28, 2011, jurisdiction hearing. Although the juvenile court found the petition true and took jurisdiction over Y.L., father remained entitled to notice by personal service or certified mail, return receipt requested. (§ 291, subd. (e)(1); *In re Jennifer O., supra*, 184 Cal.App.4th at pp. 545-546.)

The July 26, 2011, disposition report revealed the Agency had found three potential addresses for father. At the hearing on August 2, 2011, the Agency's counsel informed the juvenile court it had not "act[ed] on juris[diction] to father." In other words, the court had not ruled on whether father had received notice pursuant to section 291, subdivision (e)(1). The Agency's counsel acknowledged it "need[ed] to serve [father] for the next hearing." The court scheduled a hearing on September 27, 2011, to review whether service on father had been made.

8

At the September 1, 2011, hearing, the juvenile court bypassed both parents' reunification services, scheduled a selection and implementation hearing, orally advised mother of her right to petition for an extraordinary writ, and ordered that father receive a writ notice at all three of his possible addresses.

Then, at the September 27, 2011, hearing, the juvenile court and the Agency's counsel confirmed it had not previously "take[n] juris[diction] to father." In other words, the court had not ruled on whether father had received the notice to which he was entitled. The court's ensuing statement that, "on the 1st of September [*m*]*other was the only one that was present and she submitted on the bypass,*" indicates the court had not intended to bypass *both* parents' reunification services at that hearing. (Italics added.)

At the hearing on October 18, 2011, the juvenile court found father had been properly noticed for the hearing at all three of his addresses and then found the petition's "allegations as to him to be true." The latter finding was not redundant of the earlier (June 28, 2011) finding that the petition was true because, as the court explained, "really juris[diction] is as to the child." It appears the court's earlier finding had not been intended as an adjudication against father.

When counsel for the Agency noted the disposition report had recommended bypassing services for father, the court responded, "I think I've already acted. [¶] . . . [¶] I acted on it in advance." Counsel for the Agency replied, "[y]ou did that on September the 1st." It appears the court reaffirmed its September 1, 2011, dispositional findings as to father at the October 11, 2011, hearing.

The juvenile court's arguably premature action against father on September 1, 2011, was harmless by any standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) The only difference between the September 1 and October 11 hearings is the fact that father had received the statutory notice at the later hearing. Nothing in the record suggests the court

would have made a different determination as to father had it been facing the issue for the first time on October 11, 2011.

Father disagrees, contending the juvenile court's premature action on September 1, 2011, caused him "clear" prejudice because he was "deprived of the statutory time limits." But he does not identify any relevant time limit or explain how the delay, of less than two months, caused him any prejudice. We deem the point to be without foundation. (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647.)

In any event, father re-litigated the reunification issue in his section 388 petition. But he did not establish that reunification services were in Y.L.'s best interest. No prejudicial error appears.

## II

### *Inquiry as to Father's Indian Heritage*

Father contends the juvenile court erred when it terminated his parental rights in the absence of evidence the court or the agency had inquired as to father's Indian heritage. We agree.

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S.C. §§ 1901, 1902, 1903(1), 1911(c), 1912.) To facilitate participation, notice of the pending proceeding and the right to intervene must be sent to the tribe or to the BIA if the tribal affiliation is not known. (25 U.S.C. § 1912(a); § 224.2, subd. (a).) Once notice is provided, it must be sent for each subsequent hearing until it is determined the ICWA does not apply. (§ 224.2, subd. (b); *In re Marinna J.* (2001) 90 Cal.App.4th 731, 736.)

Father is entitled to raise the notice issue on appeal notwithstanding his counsel's failure to object in the juvenile court. (*In re Z.W.* (2011) 194 Cal.App.4th 54, 63; *In re Marinna J., supra,* 90 Cal.App.4th at p. 739; see *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 783, fn. 1.)

10

Section 224.3, subdivision (a), provides in relevant part: "The court [and] county welfare department . . . have an *affirmative and continuing duty to inquire* whether a child for whom a petition under Section 300 . . . is to be, or has been, filed is or may be an Indian child in all dependency proceedings . . . if the child is . . . in foster care." (Italics added.) Because this duty of inquiry was "continuing," it was operative during the pendency of this case and we consider whether the court's and social worker's efforts were sufficient to satisfy the duty.

It is undisputed that neither the juvenile court nor the social worker made any inquiry of father at the time of, or following, his first appearance in the case on February 1, 2012.

The Agency claims any error is harmless because father never asserted any tribal affiliation in the juvenile court or on appeal. In response, father makes an offer of proof that he has Apache and/or Blackfeet heritage.[4] (Citing, e.g., *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431 [father "should have made an offer of proof or other affirmative representation that, had he been asked, he would have been able to proffer some Indian connection sufficient to invoke the ICWA"].) Although the offer of proof is more appropriately made in an opening brief, there is no possible prejudice to the Agency. We vacate the order terminating parental rights and remand for ICWA compliance.

DISPOSITION

As to both parents, the order terminating parental rights is vacated. The matter is remanded for the purpose of providing adequate Indian Child Welfare Act notice to the relevant Apache and Blackfeet tribes. If any tribe responds that the child is an Indian

---

[4] Father's offer of proof, set forth in his reply brief, is as follows: "[Father] was not asked by the juvenile court, the social worker or his attorney whether or not he had any Indian heritage. He and his family believe they have Apache and/or Blackfoot [*sic*] heritage. His brother has been researching the family history and informed [father] of the Indian heritage."

child or eligible for enrollment, the court shall proceed as required by the Indian Child Welfare Act.  If no tribe responds that the child is an Indian child or eligible for enrollment, the court shall reinstate the order terminating parental rights.


                                                          HOCH        , J.


We concur:


      BLEASE        , Acting P. J.


      MURRAY      , J.